Original Filing Date: November 16, 2020
Redacted Filing Date: November 18, 2020

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

PELOTON INTERACTIVE, INC., )
)
Plaintiff, )
) C.A. No. _____
v. )
) **DEMAND FOR JURY TRIAL**
ICON HEALTH & FITNESS, INC., )
) **REDACTED -**
Defendant. ) **PUBLIC VERSION**

## COMPLAINT

Plaintiff Peloton Interactive, Inc. ("Peloton") brings this action against Defendant ICON
Health & Fitness, Inc. ("ICON") and alleges as follows:

1.      Since its inception in 2012, Peloton has revolutionized the fitness industry,
becoming the largest interactive fitness platform in the world with a loyal community of more than
3.6 million members. Peloton makes fitness entertaining, approachable, effective, and convenient
while fostering social connections amongst its users that encourage them to be the best versions of
themselves. Peloton delivered its first bikes (the "Peloton Bike") in 2014 and received near-
universal adulation, with Men's Health naming the Bike "the best cardio machine on the planet,"
and fitness experts hailing it as "revolutionary," and "category creating." Peloton currently
employs thousands of people across the country, and it advertises, markets, and sells its products
nationwide and around the globe.

2.      Envying Peloton's hard-fought success, competitors, including Defendant ICON,
have tried to catch up with Peloton's innovative technology and to siphon off Peloton's sales.
Historically, ICON has sold traditional fitness equipment, and it develops and manufactures
exercise equipment (including stationary bikes and treadmills) under the brand names

NordicTrack, Proform, and FreeMotion.

3.      With more competitors entering the market, it is critical for Peloton to differentiate its product offerings from the competition by highlighting their innovative content and features through creative and strategic advertising and marketing. Accordingly, Peloton has devoted significant time and resources to developing its ████ marketing and advertising strategies, including for ██████████████████████████, Peloton's marketing and advertising strategies, and the specific products and features they will promote, are highly confidential, trade secret information, which derive independent economic value from not being generally known or readily ascertainable by competitors. The unauthorized disclosure or use of Peloton's highly confidential, trade secret information prior to its authorized public release would provide Peloton's competitors with an improper, unfair advantage in competing with Peloton.

4.      In ███████, Peloton began the process of putting its confidential, trade secret strategic advertising plan into action. Production of the live action portion of Peloton's advertisements ████████████████████████████████████████ ████████████████████████████.

5.      Unbeknownst to Peloton, however, before production had even begun, a member of the ██████ production crew breached his confidentiality obligations and forwarded Peloton's highly confidential, trade secret advertising plans to a close friend at ICON, who deliberately and intentionally solicited the disclosure of that information, telling the ██████ production crew member that "it would be cool to see how they [Peloton] shot it [i.e., Peloton's advertising]."

6.      ICON then improperly acquired copies of Peloton's highly confidential advertising scripts and images of the Peloton products being used in the production of advertising materials. These confidential, trade secret advertising materials provide a detailed blueprint regarding

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

Peloton's planned advertising and overall marketing strategy for ██████████████, revealing the specific copy and visual content of the advertisements as well as Peloton's strategic decisions about ████████████████████████████████████████████████████████████████ ███████████████████████████████████████. Importantly, the materials also reveal that Peloton █████████████████████████████████████ ███████████████████████ – a valuable secret that competitors could make use of to improperly harm Peloton and gain market share by adjusting their own advertising and marketing strategies in an attempt to siphon off actual and potential Peloton customers. In sum, by deliberately soliciting the unauthorized disclosure of Peloton's highly confidential, trade secret information, ICON improperly received a treasure trove of information that would enable it to copy or pre-empt Peloton's █████████████████████████.

7.      Fortuitously, Peloton found out about ICON's misappropriation when, in the course of reviewing discovery in unrelated, ongoing patent litigation between ICON and Peloton, counsel for Peloton came across a copy of the email and attachments that ICON had improperly solicited and acquired. Peloton immediately sought to understand how its highly confidential, proprietary advertising plans had been acquired by ICON without Peloton's authorization. Despite ICON's later representation that ICON was already fully aware that it possessed the email and attachments containing Peloton's information, and was already undertaking an investigation concerning them *prior* to Peloton raising the issue, ICON never contacted Peloton to alert Peloton to the unauthorized disclosure or to ICON's possession of Peloton's confidential and trade secret information. And *after* Peloton raised the issue and requested basic information about who had received and viewed these materials, ICON's counsel provided a vague and confusing timeline of events and refused to provide basic information in response to Peloton's requests, such as the

identity and role of the employee with whom the Peloton trade secret materials had been discussed, and what date that conversation occurred. To avoid unnecessary motion practice, Peloton proposed to enter into a stipulated injunction based on ICON's representations that it had not and would not use or disclose Peloton's confidential advertising and marketing materials in its possession.  ICON rejected Peloton's proposal, refusing to enter into such a stipulation unless Peloton agreed to waive its right to assert claims related to ICON's misappropriation.  Insofar as Peloton has evidence that ICON violated the law through ICON's willful solicitation and acquisition of Peloton's trade secrets, and given that ICON has refused to voluntarily provide adequate information and assurances in response to Peloton's reasonable requests concerning ICON's handling of Peloton's trade secrets – instead, ICON's counsel has provided vague, shifting, and evasive responses to Peloton's counsel's straightforward inquiries for basic facts – ICON's demand that Peloton first agree to waive its claims as a condition for ICON's agreement to enter into a stipulated injunction was obviously unacceptable.

8.      Peloton brings this suit to protect its rights and put an end to ICON's deliberate and willful misappropriation of Peloton's confidential, proprietary, trade secret information.

## PARTIES

9.      Peloton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York, 10001.

10.      ICON is a corporation organized and existing under the laws of the State of Delaware. ICON's principal place of business is at 1500 South 1000 West, Logan, Utah, 84321. ICON sells its products online and through third-party retailers all across the United States, and additionally operates an outlet store in California, located at 630 Nicholas Road, Beaumont,

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

California, 92223.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the Defend Trade Secrets Act ("DTSA") claim, 18 U.S.C. § 1836 *et seq.*, under 28 U.S.C. § 1331.

12.     This Court has personal jurisdiction over ICON pursuant to the laws of the State of Delaware and the United States Constitution because ICON is a Delaware corporation. ICON also regularly and continuously transacts business in the jurisdiction, including marketing and selling ICON services and products throughout the State of Delaware.

13.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) & (c).

## BACKGROUND

**I.     The Parties Involved in the Production of Peloton's Advertising Campaign Agreed to Maintain the Confidentiality of Peloton's Proprietary Information**

14.     ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

Peloton works with ████████ for the creative development, content development, production, strategic planning, media planning and buying, and related services to advertise Peloton's products.

15.     ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████

16.     ███████████████████████████████████████ further provides that

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**



17. ███████████████████████████████████████ also provides that the

18. On ██████████████, Peloton began developing its advertising strategy with ████████ for ███████████████████████████ This culminated in the creation of highly confidential and trade secret scripts and production plans for ████████████████ advertising to be aired █████████████████. Pursuant to the ██████████████████████████████, Peloton holds all right, title, and interest in and to the scripts and productions plans created by and with ██████████.

19. ████████ provided Peloton a Statement of Work and Production Estimate for the production of Peloton's advertisements for ████████████████████ which included a bid made by ████████, a commercial production company, to execute the live action production component of the advertising campaign ("Peloton Production").

20.     On ████████████████, Peloton awarded ██████ and ██████ the contract for the Peloton Production. Thereafter, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ which provided, in relevant part,



21.     Additionally, pursuant to the ████████████, Peloton holds all right, title, and interest in and to the materials created or developed in connection with the ████████████.

22.     Pursuant to the ████████████, ██████ gained limited, controlled access to confidential, proprietary, trade secret Peloton information related to the Peloton Production solely to enable ██████ to perform under the parties' agreement.

23.     On ████████████████, ██████ hired Jeff Barber as a Prop Master for the Peloton Production. As Prop Master, ██████ provided Barber access to confidential, proprietary, trade secret Peloton information related to the Peloton Production. ██████ shared Peloton's confidential, proprietary, trade secret information with Barber solely to enable him to perform his responsibilities as Prop Master during the Peloton Production. It is the usual, normal, and customary industry practice for persons such as Barber to maintain in strict confidence all

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

materials received from Peloton, ███████████████████ for purposes of Barber's participation in the Peloton Production, and Barber knew and understood at all times that he was not to disclose such materials to any third persons without the prior, express, written consent from Peloton to do so, which consent Peloton did not provide to Barber.

24.     The live action shoot for the Peloton Production commenced on ████████████. Per industry practice, ██████████ required all of its production employees to sign a Confidentiality Undertaking, thereby confirming that he or she has agreed to comply with the provisions of ██████ ████████████████████████████████████████████████████ ███████████████████████████████████

25.     ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████ provides, in relevant part,



26.     On████████████████, Barber signed the Confidential Undertaking as an employee of ████████ prior to commencing work on the Peloton Production. (**Exhibit 3**.) However, even prior to signing the Confidential Undertaking, at all times Barber knew and understood that he was under an obligation to maintain the Peloton information in strict confidence as a term of his employment with ████████, and that Barber could not disclose such information to any third

persons without the express consent of Peloton, which Peloton did not provide.

## II.   Barber Provided Peloton's Highly Confidential and Proprietary Information to ICON

27.     Barber has a long-standing personal relationship with Kelley Chambers, the Director of Samples at ICON. Chambers has been an employee of ICON for over twenty years, and Barber had knowledge of Chambers's work at ICON.

28.     During a call on ██████████, Barber told Chambers that he was working on the Peloton Production. Barber told Chambers "I think I'm working with [ICON's] competition," and Chambers confirmed Barber's understanding that ICON and Peloton are separate, competing companies. The two then discussed the shoot for Peloton, and Chambers understood that Barber was in possession of written materials relating to Peloton's upcoming advertising. Chambers then deliberately solicited Barber to provide him with Peloton's confidential information, stating "it would be cool to see how they [Peloton] shot it" and "it would be interesting to see what they [Peloton] are doing" with their advertising. Barber responded that he might provide copies of Peloton's advertising materials to Chambers.

29.     Minutes later, Barber sent Chambers an email, addressed to "██████████████" with the subject "Scripts Peloton." Reflecting both Barber's and Chambers's awareness that this unauthorized disclosure of Peloton's confidential information to ICON, a direct competitor, was improper, Barber tried to cover his tracks by writing in the body of the email: "***Dont forward or show my name***." (Emphasis added). Barber attached two documents containing Peloton's proprietary information to that email, titled ██████████ ████████████████████████████████ ("Peloton's Advertising Plans"). Despite the long-standing relationship and frequent communication between Barber and Chambers, Barber had not sent this type of material to

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

Chambers before, knowing that he was obligated to keep such materials in strict confidence.

30.     Peloton's Advertising Plans that Barber sent Chambers are highly sensitive, proprietary and trade secret documents. Barber had no legitimate reason to send these documents to Chambers or anyone at ICON, and he was prohibited from doing so. ICON also understood that Barber was not authorized to disclose the materials to ICON, and that his doing so was a breach of confidentiality. ICON had no legitimate reason to request or receive these documents and had no permission to do so. Chambers's deliberate solicitation of Peloton's confidential information from Barber was a clear-cut case of industrial espionage that is prohibited by law.

31.     Chambers thereafter printed at least one copy of Peloton's Advertising Plans and told at least one other person at ICON that he had received Peloton's Advertising Plans.

32.     Despite this, ICON did nothing to alert Peloton to the fact of ICON's acquisition of Peloton's Advertising Plans. Indeed, as discussed below, it was not until *after* Peloton brought its discovery of the matter to ICON's attention that ICON's counsel belatedly conceded that ICON was already well aware that ICON had come into possession of Peloton's Advertising Plans.

### III.   Peloton Discovers Barber and ICON's Misappropriation of Peloton's Highly Confidential and Proprietary Trade Secrets

33.     On or around November 8, 2020, in the course of reviewing documents produced by ICON in connection with ongoing patent litigation, Peloton's counsel first discovered evidence of Barber's unauthorized transmission of Peloton's Advertising Plans to ICON (Bates number ICON_PELOTON00029543).

34.     On November 9, 2020, Peloton's lawyers reached out to Barber to inquire about what had occurred. After being contacted by Peloton's lawyers, Barber deleted photos of Peloton Bikes used in the Peloton Production from text messages that he had sent to Chambers ████████. However, Barber did not succeed in fully expunging the photographs from his phone and he

has since provided copies of those photographs to Peloton's counsel.

35.    On the evening of November 9, 2020, Peloton's counsel alerted ICON's counsel that it had discovered a misappropriation of Peloton's proprietary information by ICON, its employee Chambers, and by Barber. Peloton demanded that ICON immediately cease and desist from any further use, disclosure, distribution, publication or dissemination of confidential or proprietary Peloton information and documents, including the above-referenced materials, and that ICON preserve all documents and communications of any kind relating or referring in any way to Peloton confidential material, including but not limited to the above-referenced material and any other materials obtained from Barber.

36.    ICON's counsel responded that they would "look into the matter and get back to [Peloton's counsel]."

37.    ICON's counsel sent another email to Peloton's counsel the next morning, November 10, 2020, for the first time informing Peloton that "ICON became of aware of Mr. Barber's e-mail *before*" Peloton raised the issue, and that ICON "conducted an investigation, which is still on-going." (Emphasis added). ICON's counsel further admitted that "[o]ne copy of the attachment to the e-mail was printed out by Mr. Chambers," and that Chambers had also told "someone at ICON that he had the information." ICON's counsel did not identify the name or job responsibilities of the other person at ICON to whom Chambers had spoken. ICON's counsel merely asserted that the person to whom Chambers made this disclosure "immediately informed ICON's legal department which was the impetus for the investigation."

38.    When Peloton's counsel reasonably requested additional information regarding Chambers's employment at ICON, information regarding the unidentified person Chambers told he was in possession of Peloton's proprietary information, and when that conversation occurred,

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

ICON's counsel stonewalled, stating that such information "may be more appropriate for ICON to respond in the process of, and protections afforded by, the Federal Rules of Civil Procedure and the Protective Order."

39.     On November 12, 2020, Peloton proposed entering into a stipulated injunction with ICON to ensure that Peloton's confidential materials would not be used or disclosed, and that any individuals who had been exposed to those materials did not work on the marketing, advertising, or promotion of ICON's products. Given ICON's counsel's representations that ICON had already "taken steps to ensure [Peloton's information] is not used in anyway going forward," Peloton believed that such a stipulation could avoid unnecessary motion practice before the Court. However, ICON refused any form of stipulated injunction other than one made confidentially and "in lieu of litigation."   ICON's counsel went so far as to characterize this dispute as a "manufactured issue," despite Peloton's explanation of its very valid concerns regarding ICON's handling of these materials and despite Peloton's reasonable requests for necessary information. Aside from the fact that ICON's characterization of the dispute is demonstrably false – the evidence that Peloton has *already* obtained shows that Chambers willfully solicited and acquired Peloton's information, and that Chambers discussed Peloton's information with at least one other person at ICON (whom ICON's counsel *refuses to identify* by name, job title, and job responsibilities despite Peloton's requests) – it is further inexplicable that ICON's counsel could even make such a characterization about the merits of the dispute given that counsel admitted that he had "not even seen" the misappropriated information prior to rejecting Peloton's proposed stipulation, and he also indicated to Peloton in an email dated November 12, 2020, that he was not himself entirely certain about the facts concerning the steps allegedly taken within ICON to "quarantine" the misappropriated information, and he has also not explained (and apparently does

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

not know for certain) the full details of ICON's supposed internal "investigation."

## IV.   Peloton's Advertising and Marketing Plans are Confidential and Proprietary

40.     Peloton employs sophisticated marketing and advertising strategies based on extensive data collection, analysis, and creative work product. Peloton conducts a robust analysis of client preferences, buyer trends, industry and competitive analysis, and consumer response to proposed advertising when designing and selecting its advertising campaigns. Every detail of an advertisement – including the copy, talent, visual design, and selection of content – is the result of extensive effort and investment. Peloton's Advertising Plans plainly fall within the definition of proprietary, trade secret information that would confer an improper competitive advantage to a direct competitor such as ICON.

41.     Marketing and advertising is essential to Peloton's efforts to differentiate itself from competitors, who, like ICON, also offer connected-fitness products. Consumers are sensitive to how brands and products position themselves in the market, with advertising playing a key role in driving consumer interest and ultimate purchase decisions. With similar products on the market, advertising serves to dispel consumer confusion about competing products and ensure that unique product features are front of mind for potential Peloton consumers.

42.     With consumer demand for fitness products ███████████████████, marketing and advertising ████████████████ is critical for fitness companies to maximize demand and sales of their products by distinguishing themselves from the competition.

43.     Critically, █████████████████████████████████████████
███████████████████████████████████████████████████
███████████████   ███████████████████████████████████
███████████████████████████████████████   As a result,
Peloton's confidential, trade secret Advertising Plans are ████████████████████

██████████████ Indeed, Peloton's Advertising Plans clearly indicate that the ██████

███████████████ ████████████████████████ A competitor armed with this information

could modify its own advertising spend to ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████ – both strategic moves which

could enable that competitor to steal customers and market share.

44.     Since ██████████, Peloton has worked to develop confidential and proprietary

marketing strategies and advertising design for its ███████████████████ advertising

campaign. ███████████████████████████████████████████████████

████████████████████████. In total, Peloton has invested over █████████ to research,

analyze, create, and construct its forthcoming ████ advertising campaign, which included █

███████████████████████████████████████████████████████████████████

██████████████████████. Peloton anticipates investing heavily in this campaign, spending

upwards of ████████████ air advertisements in the United States alone.

45.     After developing its confidential advertising strategies, Peloton employed

████████ to develop a creative execution of those strategies and partnered with ██████████ to

refine the advertising campaign. As noted above, Peloton made limited, controlled disclosures of

its confidential information to █████████ pursuant to strict confidentiality agreements. The result

of this effort was the creation of Peloton's confidential Advertising Plans, which embody the secret

blueprint for Peloton's forthcoming ████ advertising campaign. The Advertising Plans reflect

larger strategic decisions, such as ████████████████████████████████ strategies, as

well as provide a top-to-bottom explanation of the planned advertising and marketing materials'

content – the copy that will be displayed and/or spoken, a description of the set, the sequence of

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

shots to be filmed, ███████████████████████████████████████████ ███████████████████████████, the specific content to be filmed, and the format and "look and feel" of the advertisements.

46.      Peloton's Advertising Plans reflect a host of confidential, proprietary information developed by Peloton that is critical to Peloton's efforts to distinguish itself from its competitors, including ICON. The content of the planned advertisements, captured in Peloton's Advertising Plans, embodies Peloton's strategic decisions on ████████████████████████████ ████████████████████████████████████████████████████████ ██████████. While the totality of the Advertising Plans reflects trade secret material because it is the assembly of numerous strategic decision into a cohesive audio-visual product, there are also specific trade secrets embodied in the Plans, including the following:

- Based on its analysis of buyer trends and sales, Peloton determined that ████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████ and
  reflect Peloton's choices to achieve this result, including in ███████████████████████
  ██████████████████████████  ████████████████████████
  ████████████████████████████████████████████
  Advertising Plans also reveal that Peloton ████████████████  ████████████████████████
  ████████████████ based on its strategic analysis regarding buyer trends and potential
  market demand.

- ████████████████████████████████████████████████████████
  ████████████████ which it has not used in prior ████████ campaigns. ████████████
  ████████████████████████████████████ which Peloton believes make it

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

stand out from its competitors' product offerings. Peloton believes that █████████ █████████ will differentiate its advertisements from its competitors, specifically ICON and its NordicTrack product. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

- Peloton decided to ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ This reflects a key decision in

Peloton's strategy to differentiate itself from its competitors.

- The content of the Advertising Plans also indicates ████████████████████████

██████████████████████████   ████████████████████████████████

████████████████████████████████████████████████████

████████████████████ Peloton selected this specific content based on its strategy ██████

████████████████████████████████████████████████.

47.     Peloton's Advertising Plans also reveal █████████████████████████████

███████████████████████████████   ████████████████.   ██████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████.   ████████████████

████████████████████████   ████████████████.

48.     Peloton's Advertising Plans also reveal █████████████████████████████.   The Plans

- 16 -
HIGHLY CONFIDENTIAL – FILED UNDER SEAL

███████████████████████████████████████████████████████.
This information provides insight into ████████████████████████████. ██
█████████████████████████████████████████████████████████████
████████████████████████.

49.     Peloton purposely does not release its Advertising Plans and related proprietary information publicly in advance of their deployment to protect the proprietary analytics, strategies, and product information contained therein. Peloton requires its employees to agree to maintain Peloton's proprietary information confidential as a condition of their employment, as well as includes clauses relating to confidentiality in its Code of Conduct. Peloton employs secure sign-on technology to limit access to the company's computers, email, and shared drives. Peloton also limits disclosure of proprietary information, such as Advertising Plans, within Peloton by ensuring that they are only shared on a need-to-know basis, and using password protection on documents to ensure limited access.

50.     To execute its marketing and advertising strategies, Peloton employs ████████ to create and produce its advertisements. ████████ in turn employs third parties to execute the actual production of advertisements, including filming live action scenes. Peloton requires ████████ and all of its subcontractors to maintain Peloton's confidential, proprietary information, including Peloton's Advertising Plans, confidential, as reflected in ██████████████████████████ ████████████████████████████████████████. Peloton and ████████ provide certain Peloton confidential, proprietary information to third parties on a limited, controlled, need-to-know basis solely for the purpose of enabling those parties to perform their roles in Peloton's advertising campaigns.

51.     Peloton's exclusive knowledge and use of its marketing and advertising strategies

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

and plans provide it with an economic and competitive advantage over other connected-fitness companies. Peloton's strategies and plans have been created based on significant effort and investment, allowing Peloton to engage in marketing and advertising superior to that of its competitors.

52.    ICON's access to, acquisition, and knowledge of Peloton's strategic plans causes and threatens to cause significant competitive harm to Peloton. If competitors such as ICON know Peloton's ████████████████, marketing, and advertising strategies, they can counter and undercut them. Indeed, this fact is reflected in Chambers's statement to Barber that "it would be cool to see how they [Peloton] shot it [i.e., Peloton's advertising]" and Chambers's acceptance of the confidential scripts that Barber sent in response to Chambers's deliberate solicitation.

53.    The Peloton Advertising Plans in ICON's possession include a wealth of information about Peloton's forthcoming advertising content, ██████ advertising and marketing strategies, ████████████████████████████. These Advertising Plans provide a detailed blueprint that ICON can use to create an entire advertising campaign, laying out ███████████████████████████████████████████ advertisement campaign. By obtaining improper access to Peloton's Advertising Plans, ICON can pre-empt Peloton's advertising campaign with a copycat campaign and rush to market ██████ ████████████████████, or time its advertising to drown out Peloton's media presence.

54.    In essence, by obtaining an advance "peek" into Peloton's confidential and trade secret branding and marketing strategies before Peloton publicly discloses them through the dissemination of advertising, a competitor such as ICON could deprive Peloton of the value of its advertising campaign, which is intended to distinguish Peloton from its competition and provide a

unique depiction of Peloton's products in a competitive connected-fitness market.

## FIRST CAUSE OF ACTION

### Violation of the Defend Trade Secrets Act ("DTSA")
### 18 U.S.C. § 1836 *et seq.*

55.     Peloton realleges and incorporates by reference all other allegations in this Complaint.

56.     The DTSA defines "trade secret" as:

> "[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

57.     In relevant part, the DTSA defines misappropriation as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," including breach of a duty to maintain confidentiality, or "disclosure or use of a trade secret of another without express or implied consent by a person who (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was [] (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5).

58.     Peloton's Advertising Plans constitute trade secrets. Peloton's competitive

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

advantage in the industry arises partly from its exclusive possession of its proprietary information. This includes, among other things, marketing and advertising strategies and plans. These materials have independent economic value to Peloton from not being generally known to, or readily ascertainable by, Peloton's competitors, including its direct competitor ICON.

59.    At all relevant times, Peloton took reasonable efforts to maintain the secrecy of its Advertising Plans by requiring its employees and relevant third parties to agree to confidentiality undertakings. Employees and relevant third parties are required to sign confidentiality agreements that obligate these persons to maintain the confidentiality of Peloton's proprietary information. As described above, and among other steps, Peloton limited access to its Advertising Plans and required employees and relevant third parties to acknowledge and maintain their confidentiality obligations. In particular, Barber knew and understood at all times that he was not to disclose Peloton's materials to any third persons without the prior, express, written consent from Peloton to do so, which consent Peloton did not provide to Barber. At all relevant times, Chambers also knew and understood that Barber was not authorized to disclose Peloton's confidential information, a fact that was further underscored when Barber's email stated: "***Dont forward or show my name***." (Emphasis added).

60.    ICON has violated the DTSA by acquiring Peloton's trade secrets through improper means, and, on information and belief, by using and disclosing these trade secrets without Peloton's express or implied consent.

61.    Based on the nature of Peloton's Advertising Plans, and the manner in which they were received, ICON had reason to know that it was improperly in possession of Peloton's confidential, proprietary information.

62.    Upon information and belief, ICON has used or will use Peloton's Advertising

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

Plans in connection with ICON's advertising and marketing strategies, to Peloton's detriment.

63.     As a direct result of ICON's deliberate and willful violation of the DTSA, Peloton has suffered and will in the future suffer irreparable harm based on its loss of exclusive control of and access to its own Advertising Plans. ICON has benefited unfairly at Peloton's expense. The misappropriated information is a guide for a competitor such as ICON to create its own marketing and advertising strategies to undercut Peloton during ███████████████████.

## PRAYER FOR RELIEF

Peloton respectfully requests the following relief:

1.     A preliminary and permanent injunction:

(a) enjoining ICON from allowing or permitting any of its employees, independent contractors, officers, directors, agents or representatives who have possessed, received or reviewed any copy, portion or summary of the e-mail message bearing Bates number ICON_PELOTON00029543, or any of the documents attached thereto, or any information obtained or derived from such materials, from participating in, reviewing, commenting upon, working on, collaborating on, or assisting in any way with marketing, advertising or promotion of any product or service of ICON or any of its brands, subsidiaries or affiliates through and including ████████; and

(b) enjoining ICON, including employees, independent contractors, officers, directors, agents and representatives of ICON and its brands, subsidiaries, and affiliates from accessing, copying, using, distributing, publishing or disclosing any copy, portion, summary of, or information obtained or derived from the e-mail message bearing Bates number ICON_PELOTON00029543, or any of the

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

documents attached thereto.

2.      An accounting of ICON's use of the information misappropriated from Peloton;

3.      Judgment in favor of Peloton and against ICON on all claims;

4.      Compensatory and punitive damages to be proven at trial;

5.      Reasonable costs and expenses incurred in this action, including attorneys' fees and

costs of suit, to the full extent permitted by law; and

6.      All other relief, legal or equitable, this Court deems appropriate.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mflynn@mnat.com
amoshos@mnat.com

*Attorneys for Plaintiff Peloton Interactive,*
*Inc.*


OF COUNSEL:

Steven N. Feldman
Harry Mittleman
Ashley Artman
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4272

November 16, 2020

- 22 -
**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**