IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PELOTON INTERACTIVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 20-1535 (UNA) |
| | ) | |
| ICON HEALTH & FITNESS, INC., | ) | **REDACTED –** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PELOTON INTERACTIVE, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Michael J. Flynn (#5333)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@mnat.com
amoshos@mnat.com

OF COUNSEL:

Steven N. Feldman
Harry Mittleman
Ashley Artmann
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

*Attorneys for Plaintiff Peloton Interactive, Inc.*

Original Filing Date: November 16, 2020
Redacted Filing Date: November 18, 2020

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................... 4

      A.    The Competitive Importance and Value of Advertising and
            Marketing Plans In the Industry Generally ................................................ 4

      B.    Peloton Has Invested Substantial Resources to Create Confidential,
            Strategic Marketing and Advertising Plans for ▮▮▮▮▮▮▮▮
            ▮▮▮▮▮▮▮ ..................................................................... 5

      C.    Peloton Partnered With Third Parties To Create And Produce
            Peloton's Advertising Plans Pursuant To Strict Confidentiality
            Agreements ................................................................................................. 6

      D.    Jeff Barber, the Prop Master For The Peloton Production Obtains
            Peloton's Advertising Plans Pursuant To Confidentiality
            Obligations ................................................................................................. 7

      E.    ICON Employee Kelley Chambers Willfully Solicits and Acquires
            Peloton's Advertising Plans from Barber ................................................. 8

      F.    Peloton Discovers ICON's Misappropriation ......................................... 9

      G.    ICON Admits That It Was Already Aware That Chambers
            Acquired Peloton's Advertising Plans, But Refused To Voluntarily
            Provide Additional Information And To Enter Into A Stipulated
            Injunction To Protect The Plans .............................................................. 9

      H.    Peloton Has Taken Reasonable Measures to Safeguard Its
            Confidential and Trade Secret Information ............................................ 10

III.  ARGUMENT ................................................................................................. 11

      A.    Peloton is Likely to Succeed on the Merits of its Claims ..................... 12

      B.    Peloton is Threatened With Imminent, Irreparable Harm If ICON
            is Not Enjoined ....................................................................................... 16

      C.    Peloton's Narrowly Tailored Request For Injunctive Relief Will
            Simply Maintain The Legal Status Quo And Not Cause Greater
            Harm to ICON .......................................................................................... 19

      D.    The Public Interest Favors Granting a Preliminary Injunction to
            Peloton ..................................................................................................... 20

IV.   CONCLUSION ............................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

Page

**Cases**

*Art & Cook, Inc. v. Haber*,
416 F. Supp. 3d 191 (E.D.N.Y. 2017) ...................................................................13

*AstraZeneca AB v. Dr. Reddy's Labs., Inc.*,
145 F. Supp. 3d 311 (D. Del. 2015)......................................................................18

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
425 F.3d 964 (11th Cir. 2005) ..............................................................................19

*Dish Networks L.L.C. v. Ramirez*,
2016 WL 3092184 (N.D. Cal. June 2, 2016) ........................................................19

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
730 F.2d 61 (2d Cir. 1984).....................................................................................18

*Henry Schein, Inc. v. Cook*,
191 F. Supp. 3d 1072 (N.D. Cal. 2016) ...........................................................19, 20

*Joshua David Mellberg LLC v. Will*,
96 F. Supp. 3d 953 (D. Ariz. 2015) ......................................................................13

*Kos-Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)...................................................................................18

*Lepton Labs, LLC v. Walker*,
55 F. Supp. 3d 1230 (C.D. Cal. 2014) ......................................................13, 14, 16

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)...................................................................................19

*NutraSweet Co. v. Vit-Mar Enters., Inc.*,
176 F.3d 151 (3d Cir. 1999)...................................................................................12

*PepsiCo, Inc. v. Redmond*,
54 F.3d 1262 (7th Cir. 1995) .................................................................................13

*Roton Barrier, Inc. v. Stanley Works*,
79 F.3d 1112 (Fed. Cir. 1996)................................................................................13

*SI Handling Sys., Inc. v. Heisley*,
753 F.2d 1244 (3d Cir. 1985).................................................................................20

*Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*,
2014 WL 5088690 (D. Del. Oct. 9, 2014) .......................................................12, 20

*TP Group-CI, Inc. v. Vetecnik*,
    C.A. No. 16-623-RGA, 2016 WL 5864030 (D. Del. Oct. 6, 2016)........................................11

*Yeiser Research & Dev., LLC v. Teknor Apex Co.*,
    2018 WL 3993370 (S.D. Cal. Aug. 21, 2018) ........................................................................13

**Rules and Statutes**

18 U.S.C. § 1836...................................................................................................................*passim*

18 U.S.C. § 1836(b)(1) .....................................................................................................................12

18 U.S.C. § 1836(b)(3)(A)(i)-(ii) .....................................................................................................13

18 U.S.C. § 1839(3) ...........................................................................................................................13

18 U.S.C. § 1839(5) ...........................................................................................................................15

Plaintiff Peloton Interactive, Inc. ("Peloton" or "Plaintiff") respectfully submits this brief in support of its motion for a temporary restraining order ("TRO") and preliminary injunction ("PI") against ICON Health & Fitness, Inc. ("ICON").

## I.      INTRODUCTION

This case concerns the willful solicitation and misappropriation of Peloton's trade secrets by ICON, a direct competitor of Peloton.

On ███████████ longtime ICON employee Kelley Chambers improperly solicited and wrongfully acquired confidential, proprietary, trade secret plans for Peloton's forthcoming ███ ██████████████████ advertising and marketing campaign ("Peloton's Advertising Plans") from Jeff Barber, a contact of his who was working on a production shoot for Peloton and who had obtained Peloton's Advertising Plans pursuant to strict confidentiality undertakings. As set forth in Mr. Barber's sworn declaration (attached), following Chambers's solicitation, Barber emailed the Advertising Plans to Chambers's ICON email address, writing "***Dont [sic] forward or show my name***," confirming the common-sense truth that both men fully understood the illicit nature of Chambers's acquisition. Barber has since admitted that he knowingly violated his confidentiality obligations when he acceded to Chambers's request to obtain Peloton's Advertising Plans. Peloton has also confirmed with ICON's counsel that after acquiring Peloton's Advertising Plans, Chambers, at a minimum (the full extent of the misappropriation remains unknown), printed out a hard copy of them, and discussed them with another ICON employee who ICON's attorneys have refused to identify.

To be clear, the Peloton Advertising Plans currently in ICON's possession embody a highly sensitive and confidential blueprint for Peloton's entire forthcoming advertising campaign and reflect Peloton's detailed marketing and advertising strategy for ███████████████████

████████████████████████████████████████████████████. By

obtaining Peloton's Advertising Plans prior to the public reveal of Peloton's advertising campaign,

ICON now possesses sufficient information to create a copycat advertising campaign to preempt

or drown out Peloton's planned advertising. Such a counter-campaign would █████████████

████████████████████████████████████ Furthermore, through

its willful misappropriation, ICON currently possesses the confidential results of Peloton's

months-long analytical and creative effort, which reveal ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ .

     Put simply, as result of ICON's misappropriation, Peloton is suffering irreparable harm

and seeks necessary injunctive relief from this Court to remove Peloton's Advertising Plans from

ICON's hands, secure the return of all copies, and prevent ICON's unfair competition.

     This Court should be aware that Peloton made every reasonable effort to avoid the need

for urgent motion practice on this issue—repeatedly offering to ICON's counsel the opportunity

to enter into a stipulated injunction reasonably tailored to protect Peloton's trade secrets from any

further disclosure or use by ICON. But ICON insisted that it would not agree to any such

stipulation unless Peloton first agreed—without the benefit of full information or discovery into

the full extent of the misappropriation—not to sue ICON for the misappropriation of these trade

secrets. For obvious reasons, such conditions were completely unacceptable, and Peloton was

forced to proceed with this important, time-sensitive motion.

Based on the parties' meet-and-confer efforts, Peloton anticipates that in response to this motion ICON will argue that this is much ado about nothing, and that no TRO need be entered because ICON has apparently "quarantined" the misappropriated Peloton materials and said that they will not be used. But this argument misses the point entirely. *First*, it begs the question: if ICON does not intend to use the misappropriated Peloton materials in its possession, why does it refuse to stipulate to a reasonable injunction? *Second*, the argument incorrectly assumes Peloton is required to simply sit back and accept ICON's assurances even though ICON's counsel has refused to provide answers to numerous critical questions such as (1) who else at ICON (including the unidentified person Chambers spoke to) has been exposed to Peloton's Advertising Plans, and whether they are involved with ICON's own advertising, marketing, and product design efforts; (2) when did ICON first become aware of Barber's email to Chambers; (3) what is the nature, extent, and status of ICON's supposed "ongoing" investigation into Barber's email and steps to ensure that the confidential Plans have not been and will not be used; and (4) what, if any, changes has ICON made to its own advertising, marketing, and product design plans since Chambers received Barber's email, and why were those changes made?  Without answers to these and other key questions, Peloton is left to guess the circumstances and extent of ICON's misappropriation of Peloton's trade secrets.

With ███████████████████████████████████, it is critical that the Court enjoins further misappropriation of Peloton's Advertising Plans that the evidence proves ICON willfully solicited and acquired in violation of law.  Peloton therefore respectfully moves this Court for a TRO and PI against ICON. Peloton's purpose in seeking this relief is simple: Peloton knows that ICON acquired, copied, and disclosed Peloton's Advertising

Plans, and Peloton seeks narrow and appropriate injunctive relief to prevent ICON from further exploiting or benefitting in any way from its misappropriation of Peloton's trade secrets.

## II.      STATEMENT OF FACTS

Since its inception in 2012, Peloton has revolutionized the fitness industry, becoming the largest interactive fitness platform in the world. Interactive fitness (or connected fitness) refers to exercise equipment featuring technology that allows the equipment to communicate information about the user's workout (which typically occurs at home) to a remote instructor leading a live or recorded class comprising numerous users of such connected equipment. Peloton is proud to have earned the business of more than 3.6 million members who use Peloton's products and subscribe to Peloton's services. Peloton makes fitness entertaining, approachable, effective, and convenient while fostering social connections that encourage its members to be the best versions of themselves. Peloton employs thousands of people across the country, and its products are sold in interstate commerce and globally. Declaration of Ryan Dillon-Curran ("Ryan Decl.") at ¶ 2.

ICON is a direct competitor of Peloton in the at-home and connected-fitness markets. ICON has sold traditional fitness equipment, and it develops and manufactures exercise equipment under the brand names NordicTrack, Proform, and FreeMotion. Ryan Decl. at ¶ 3.

### A.      The Competitive Importance and Value of Advertising and Marketing Plans In the Industry Generally

It almost goes without saying that companies try to safeguard and protect their marketing and advertising plans, scripts, formats, and related materials from being disclosed in advance to their competitors. Peloton naturally and rightfully considers its marketing and advertising plans to be highly sensitive, confidential, proprietary, trade secret information, and Peloton would never voluntarily disclose such information to a direct competitor. Ryan Decl. at ¶ 4.

Marketing and advertising plans are highly sensitive, confidential, propriety, and trade secret protected information, as this information has significant implications for how a company attracts new customers, hits its quarterly sales targets, positions itself in the market, maintains goodwill, and distinguishes itself from competitors. Moreover, marketing and advertising plans have heightened importance when a key component of those plans – the launch and run window, look, feel, and content of the advertisements – have not yet been made public. Ryan Decl. at ¶ 5.

The content of planned advertisements embodies a company's strategic decisions on three key issues. The "what" – the copy, the products and/or features displayed – reflects the message selected to drive the maximum consumer response. The "who"– the depiction of the consumer – reflects who the company feels represents is the optimal prospective consumer. The "how" – the treatment, look, and feel of the advertisement – reflects how the company communicates its brand and distinguishes itself from competitors. In sum, advertising content is the product of numerous key strategic decisions which are ultimately reflected in how the content is assembled and integrated into a cohesive audio-visual product. As discussed herein, all of this is true of Peloton's advertising content that ICON has misappropriated, which reveals Peloton's strategic decisions ███
████████████████████████████████████████. Ryan Decl. at ¶¶ 6, 22.

**B.     Peloton Has Invested Substantial Resources to Create Confidential, Strategic Marketing and Advertising Plans for** ████████████████████████

Since ████████ Peloton has worked to develop confidential and proprietary marketing strategies and advertising design concepts for its forthcoming advertising campaign for ███
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

This advertising campaign will air ██████████████████████████████████
████████████████████████████████. Ryan Decl. at ¶ 7.

- 5 -

Peloton invested substantial resources in developing these strategies, which provide Peloton a competitive advantage over others. Peloton's marketing and advertising strategies are the result of extensive data collection, analysis, and creative work product. Indeed, Peloton invested over ███████ to construct its forthcoming ██████ advertising campaign, including ████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████. This does not include the costs of airing the advertisements, for which Peloton anticipates spending upwards of ███████ in the United States alone. Ryan Decl. at ¶ 8.

████████████████████████████████████████

████████████████████████████████████████████

██████████████████ Ryan Decl. at ¶ 9.

**C.**      **Peloton Partnered With Third Parties To Create And Produce Peloton's Advertising Plans Pursuant To Strict Confidentiality Agreements**

████████████████████ is an independent advertising agency that Peloton works with to develop its marketing and advertising strategies and content. Peloton and ████████ worked together to create highly confidential and trade secret scripts and production plans for

████████████████████████████████████████████████

██████ ("Peloton's Advertising Plans"). Ryan Decl. at ¶ 10. Peloton's Advertising Plans are based on a robust analysis of client preferences, buyer trends, industry and competitive analysis, and consumer response to proposed advertising, and reflect Peloton's strategic choices about ████

███████████████████████████ Peloton's Advertising Plans also provide a top-to-bottom explanation of its planned advertising content – the copy, a description of the set, the sequence of shots to be filmed, ██████████████████████████

████████████████████████████, the specific content to be filmed, and the format and "look and feel" of the advertisements. *Id.* at ¶¶ 11, 22.

Peloton provided ██████ with a limited, controlled disclosure of its confidential information for purposes of creating Peloton's advertising campaign and subject to the parties' contract, which imposes confidentiality requirements on the use and disclosure of Peloton's information. Ryan Decl. at ¶ 10. Peloton and ████████ entered into an agreement specifying that in order to share confidential information with a third party, the third party must also agree to be bound by all confidentiality obligations in the agreement. *Id.* at Ex. 1 (████████████████ ███████████████). In connection with this arrangement, ████████ provided Peloton a Statement of Work and Production Estimate, which included a bid made by ██████████ ████████, a video production company, to execute the live action component of Peloton's campaign (the "Peloton Production"). On ████████████, Peloton awarded ████████ and ████████ the contract for the Peloton Production. *Id.* at ¶ 12.

On behalf of Peloton, ████████ entered into a Production Agreement with ████████████ ████████████ pursuant to which ████████ gained limited, controlled access to confidential, proprietary, trade secret Peloton information solely to enable ████████ to perform under the ████████████████████████████, which impose confidentiality requirements on the use and disclosure of Peloton's information. Ryan Decl. at ¶ 13 & Ex. 2 (████████████).

### D.    Jeff Barber, the Prop Master For The Peloton Production Obtains Peloton's Advertising Plans Pursuant To Confidentiality Obligations

On or around ████████████, ████████ hired Jeff Barber as a Prop Master for the Peloton Production. Declaration of Jeff Barber ("Barber Decl.) at ¶ 3; Ryan Decl. at ¶ 14. ████████ provided Barber access to confidential, proprietary, trade secret Peloton information

related to the Peloton Production solely to enable Barber to perform his responsibilities during the Peloton Production. Ryan Decl. at ¶ 14. Specifically, ██████ provided Barber with copies of Peloton's Advertising Plans, subject to Barber's agreement to maintain confidentiality. Barber Decl. ¶ 5.

It is the usual, normal and customary industry practice for persons such as Barber to maintain in strict confidence all materials received from Peloton, ████████████ for purposes of Barber's participation in the Peloton Production, and, here, Barber has admitted in a sworn declaration that he knew and understood at all relevant times that he was not to disclose the Peloton materials he received to any third persons without the prior, express, written consent from Peloton to do so–and Peloton did not give such consent. Barber Decl. at ¶¶ 4-5; Ryan Decl. at ¶ 15. Barber signed a written Confidentiality Undertaking related to Peloton's Advertising Plans, but Barber understood that he was to maintain Peloton's Advertising Plans in confidence and not disclose them to third persons even before he signed the Confidentiality Undertaking. Barber Decl. at ¶ 6 & Ex. 1 (Confidential Undertaking).

### E. ICON Employee Kelley Chambers Willfully Solicits and Acquires Peloton's Advertising Plans from Barber

Barber has a long-standing personal relationship with Chambers. On ████████, they had a phone call. Barber, who knew that Chambers has worked for ICON for over twenty years, told Chambers "I think I'm working with [ICON's] competition," and Chambers confirmed that ICON did not own Peloton and the companies are competitors. The two then discussed the shoot for Peloton. Recognizing that Barber had the scripts for Peloton's advertising, Chambers said "it would be cool to see how they [Peloton] shot it" and "it would be interesting to see what they [Peloton] are doing." Barber told Chambers that he might send him copies of Peloton's scripts, and Chambers did not deter Barber from doing so. Barber Decl. at ¶¶ 7-8. When their phone call

ended, Barber sent Chambers an email with Peloton's Advertising Plans attached, writing in the email "***Dont forward or show my name***." *Id.* at ¶ 9 & Ex. 2 (███████ email with attachments). On ███████, Barber texted Chambers two photographs of Peloton Bikes used in the Peloton shoot. *Id.* at ¶ 10. Barber had never before sent Chambers scripts or other materials he was provided for use in a production. *Id.* at ¶¶ 9-10. Barber has admitted knowing his disclosures to Chambers were unauthorized and improper. *Id.* at ¶¶ 4-6.  Industry practice, common sense and the "Dont forward or show my name" email all dictate that Chambers knew this as well.

### F.      Peloton Discovers ICON's Misappropriation

Peloton only recently discovered ICON's misappropriation, entirely by chance, when its outside counsel was reviewing documents that ICON produced in discovery in separate, ongoing patent litigation. ICON's production included the "smoking gun" email from Barber to Chambers that attached Peloton's Advertising Plans. Upon finding these materials, Peloton's counsel first became aware of ICON's misappropriation of Peloton's trade secrets. ICON had not taken any prior steps to advise Peloton of ICON's improper acquisition of Peloton's confidential, proprietary information. When it produced the documents, ICON did not even direct Peloton's attention to the existence of the materials in question, which were buried in a larger production of more than 80,000 pages of unrelated documents. In other words, even after reviewing, Bates stamping, designating the materials as confidential, and producing them, ICON took no steps whatsoever to alert Peloton to the fact of ICON's unauthorized acquisition of Peloton's confidential, proprietary information. Declaration of Steven N. Feldman ("Feldman Decl.") at ¶ 2.

### G.      ICON Admits That It Was Already Aware That Chambers Acquired Peloton's Advertising Plans, But Refused To Voluntarily Provide Additional Information And To Enter Into A Stipulated Injunction To Protect The Plans

Once Peloton discovered ICON's misappropriation, it promptly contacted ICON's counsel to alert them of Peloton's discovery. ICON's counsel advised Peloton that ICON already knew

about its acquisition of Peloton's Advertising Plans, that Chambers had printed out a hard copy of them, and that Chambers had spoken to someone else at ICON (an as-yet-unidentified ICON employee who works outside of the legal department) about the Peloton information he had improperly acquired. ICON's counsel also told Peloton's counsel that ICON was and is conducting an "ongoing" internal investigation into the misappropriation. Feldman Decl. ¶ 3 & Ex. 1.

Understandably, Peloton had serious questions about ICON's misappropriation of Peloton's trade secrets. Yet despite Peloton's reasonable requests for additional information, ICON refused to provide basic facts, including the name, title and job responsibilities of the ICON employee to whom Chambers spoke about Peloton's Advertising Plans (notably leaving unanswered whether that individual has been or will be involved in ICON's marketing and advertising), as well as Chambers's work history at ICON. ICON instead chose to stonewall, stating that ICON would only respond to formal discovery requests served pursuant to the Federal Rules of Civil Procedure. Feldman Decl. ¶ 3 & Ex. 1. As a consequence, many serious questions about ICON's misappropriation remain unanswered.

Peloton's outside counsel proposed to ICON's outside counsel that, to avoid motion practice seeking injunctive relief, ICON agree to a stipulated injunction that was reasonably tailored to protect Peloton's trade secrets from any further disclosure or use by ICON. ICON, however, insisted that Peloton must first agree (without the benefit of full information or any discovery) not to sue ICON. ICON's conditions, obviously, were completely unacceptable, and Peloton could not agree to them. Feldman Decl. ¶ 6 & Ex. 1.

### H.   Peloton Has Taken Reasonable Measures to Safeguard Its Confidential and Trade Secret Information

As discussed above, Peloton diligently protects the confidentiality of its marketing and advertising plans, including Peloton's Advertising Plans that are at issue in this case.

Peloton requires its employees to agree to maintain Peloton's proprietary information confidential as a condition of their employment, and includes clauses relating to confidentiality in Peloton's Code of Conduct. Ryan Decl. at ¶ 18 & Ex. 5 (Peloton's Code of Conduct). Peloton also requires relevant employees to sign pre-invention assignment agreements as a condition of their employment. *Id.* at ¶ 18. Peloton also uses secure sign-on technology to limit access to the company's computers, email, and shared drives. Peloton also limits disclosure of confidential, proprietary, trade secret information, including Peloton's Advertising Plans at issue in this action, within Peloton by ensuring that they are only shared on a need-to-know basis. Additionally, Peloton uses password protection on documents to ensure limited access. *Id.* at ¶ 19.

Moreover, as noted above, when Peloton employs third party creative and production companies to create its advertising campaigns, Peloton provides certain confidential, proprietary, trade secret information on a limited, controlled, need-to-know basis, solely for the purpose of those parties performing their role in Peloton's advertising campaigns. Peloton requires any third party who receives access to such information to maintain its confidentiality. All of this is true in the case of Peloton's Advertising Plans, which third parties were properly provided access to subject to the confidentiality provisions in the ███████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████. *Id.* at ¶ 20 & Exs. 1, 2, 3, 4.

## III.   ARGUMENT

A preliminary injunction requires that the plaintiff establish four elements: "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *TP Group-CI, Inc. v. Vetecnik*, No. 16-623-RGA, 2016 WL

5864030, at *1 (D. Del. Oct. 6, 2016) (citing *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). "A request for a TRO is governed by the same general standards that govern the issuance of a preliminary injunction." *Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, 2014 WL 5088690, at *1 (D. Del. Oct. 9, 2014) (granting motion for a temporary restraining order). Peloton can easily establish each of these elements based on documents produced by ICON, documents turned over to Peloton by Barber, and Barber's sworn declaration, as well as the other declarations submitted by Peloton in support of this motion.

A.     **Peloton is Likely to Succeed on the Merits of its Claims**

The evidence already developed in this matter clearly shows actionable misappropriation by ICON of Peloton's trade secrets. Chambers deliberately solicited and knowingly acquired Peloton's Advertising Plans from Barber. Chambers knew that Barber was prohibited from disclosing those materials—and Barber made this common-sense fact abundantly clear when he wrote "dont [*sic*] forward or show my name" in his email to Chambers. Chambers made at least one hard copy of Peloton's Advertising Plans and discussed them with at least one other, as-yet unidentified ICON employee before ICON's legal department was allegedly alerted to these acts of misappropriation. This evidence makes it highly likely that Peloton will succeed in showing that ICON violated the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA").

The DTSA provides trade secret owners with a private right of action for the misappropriation of their trade secrets if the "trade secret is related to a product or service used in . . . interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Here, Peloton's Advertising Plans are related to interstate or foreign commerce due to the nature of Peloton's business, which focuses on selling its products to customers nationwide and globally.

The DTSA expressly allows courts to grant injunctive relief "to prevent an actual or threatened misappropriation" and "if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(i)-(ii).

Under the DTSA, a "trade secret" includes:

> all forms and types of financial, business,...economic or [] information, including...compilations,...methods, techniques, processes, procedures, [or] programs [], whether tangible or intangible...if- (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Peloton's Advertising Plans plainly constitute "trade secrets." It is well established that "marketing-related information, such as marketing plans and marketing analysis may constitute a trade secret." *Yeiser Research & Dev., LLC v. Teknor Apex Co.*, 2018 WL 3993370, at *5 (S.D. Cal. Aug. 21, 2018). Indeed, "branding/marketing strategies" developed for a brand are precisely "the sort of business information that the DTSA was designed to protect[]." *Art & Cook, Inc. v. Haber*, 416 F. Supp. 3d 191, 197 (E.D.N.Y. 2017); *see also PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (trade secret law protects marketing plans); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1117 (Fed. Cir. 1996) (trade secret law protects market analysis information); *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 980 (D. Ariz. 2015) ("To state a claim for misappropriation of trade secrets, courts have found sufficient allegations that a defendant misappropriated strategies and plans for advertising and marketing.") (collecting cases).

The case of *Lepton Labs, LLC v. Walker*, 55 F. Supp. 3d 1230 (C.D. Cal. 2014), is instructive. There, Lepton Labs, LLC ("Lepton") teamed up with a promotion/marketing company called Focus Marketing ("Focus") to market Lepton's product AllDaySlim. *Id.* at 1234. Lepton

- 13 -

and Focus entered into a written agreement with W4, an online marketing company, where W4 agreed not to disclose Lepton's confidential information, and Lepton provided W4 with trade secret information including Lepton's "strategy and plans for advertising, marketing, and distributing" AllDaySlim. *Id.* Lepton had developed "a particular pattern of messages, photographs and information, which constituted the most effective advertising campaign for promoting AllDaySlim," including "logos, slogans, motivational content, scientific content, audio-visual content, testimonials, active-ingredient lists, product price, and overall look and feel," which W4 acquired pursuant to its agreement with Lepton and Focus. *Id.* at 1234-35.

An employee at W4, Rachel Lasseff, subsequently emailed to Andrew Jenson, who worked for Lepton's competitor, Gulf Rayz, materials titled "All Day Slim Creatives" that "disclosed to Gulf Rayz Lepton Lab's most effective creative materials." *Id.* at 1235. The district court held that Lepton's "creative material," including Lepton's "strategy and plans for advertising, marketing and distribution of its products," constituted protectible trade secrets. *Id.* at 1238. The district court further held that Lepton's allegation that Gulf Rayz had acquired the materials from W4 stated a claim for misappropriation of trade secrets, noting "the most damning allegations come from the email titled 'All Day Slim Creatives' sent from W4's Rachel Lasseff to Gulf Rayz's Jensen. Lasseff states that she 'sent them all,' referring to Plaintiffs' email creatives." *Id.*

This case is highly similar to *Lepton Labs*, both in terms of the trade secrets at issue (confidential marketing and advertising plans), and in terms of the evidence of the initial acts of misappropriation (here, Chambers's acquisition of Peloton's trade secrets via Barber's "dont [*sic*] forward or show my name" email and Barber's subsequent texts.). As previously discussed, Peloton's Advertising Plans include highly sensitive, valuable trade secret information regarding Peloton's confidential marketing and advertising strategies. This confidential information was

developed by Peloton through extensive investment and effort, and reflects a calculated, deliberate advertising and marketing strategy. Moreover, the Plans reveal ████████████████████ ████████ This is valuable business information that Peloton took great care to keep secret by limiting access to Peloton's employees and independent contractors and requiring employees and independent contractors to sign confidentiality agreements. None of this trade secret information is generally known to the public, nor is it the type of information that could be reverse engineered from publicly available information. Peloton's Advertising Plans have intrinsic economic value because they provide ICON an advance peek at how Peloton plans to advertise, market, and design its products, allowing ICON to create tailored counter-marketing and advertising strategies to respond to Peloton's advertising campaign, and ████████████████ ██████████, in order to target and solicit away Peloton's customers. *See* Ryan Decl. at ¶¶ 22-23.

"Misappropriation" is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5). "Improper means" includes "theft . . . breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic . . . means." *Id*. § 1839(6). ICON committed clear misappropriation under the DTSA.

Chambers deliberately solicited and acquired Peloton's trade secrets from Barber, noting that it "would be cool to see" how Peloton was creating and shooting its advertising prior to its public release. In response, Barber provided them to Chambers, noting in his email that Chambers should not forward the email or use Barber's name. Common sense, industry practice, and the surrounding circumstances dictate that Chambers was aware that Barber was not authorized to

disclose these materials to ICON. *See Lepton Labs,* 55 F. Supp. 3d at 1238 ("[T]he most damning allegations come from the email titled 'All Day Slim Creatives'" containing plaintiff's trade secrets).

While it is understandable that Chambers would think it would be helpful to possess advance copies of Peloton's Advertising Plans—as they provide ICON with an unauthorized preview into Peloton's strategy and thus give ICON an unfair head start in creating ICON's counter-marketing, advertising, and product design strategies—Peloton obviously had no intention of prematurely disclosing its valuable trade secrets to anyone, let alone a direct competitor, and Chambers knew that. Despite this, Chambers willfully solicited and acquired Peloton's Advertising Plans from Barber, in breach of Barber's confidentiality obligations. Chambers went on to print out a hard copy of Peloton's Advertising Plans and make a further unauthorized disclosure when he told someone else at ICON (who ICON's counsel has refused to name) about Peloton's confidential information. This is a clear case of misappropriation of trade secrets. Accordingly, at this stage it is very likely that Peloton will succeed in proving that ICON intentionally and willfully violated the DTSA.

### B.   Peloton is Threatened With Imminent, Irreparable Harm If ICON is Not Enjoined

Peloton will suffer irreparable harm if anyone at ICON who was exposed to Peloton's Advertising Plans (whether by viewing them or hearing about their contents) is permitted to use or disclose them, including by working on ICON's marketing and advertising strategies that target Peloton's customers and potential customers, ██████████████████████.

ICON, which is one of Peloton's direct competitors, has obtained valuable non-public information and insights about Peloton's marketing and advertising strategies, internal decision-making, and a blueprint for Peloton's planned advertising campaign. Peloton's Advertising Plans

- 16 -

tell ICON such confidential information as the facts that █████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████ Additionally, because Peloton's
Advertising Plans ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
███████████████████ Ryan Decl. at ¶ 22.

Furthermore, ICON will be able to use the information contained in Peloton's Advertising
Plans as it formulates its own marketing and advertising strategy. ICON may be able to use this
information to, among other things, (1) create a copycat advertising campaign such that Peloton's
advertisements will no longer be distinct in the marketplace; (2) redirect advertising spend to
strategically counter Peloton's advertising spend, ████████████████████████████████████

- 17 -



; (3) shape its advertising and marketing strategy to target ▬▬▬▬▬▬▬▬▬▬▬ that Peloton has determined to target based on its proprietary market analysis; (4) ▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬, so as to directly compete with Peloton's product offerings; (5) ▬▬▬▬▬▬▬▬▬▬▬▬▬▬; and (6) bid on advertising locations ▬▬▬▬▬ where Peloton's advertising will run, which could cause Peloton's advertising spend to increase, and/or which could allow ICON to secure ▬▬▬ ▬▬▬▬▬ where Peloton is looking to advertise.

As a result, Peloton could lose the benefits of its significant investment into its marketing and advertising strategy, which is meant to distinguish Peloton's products from those of its competitors, including ICON. Moreover, Peloton could also experience a decline in market share, sales, and goodwill if ICON were permitted to exploit its unauthorized "advance peek" at Peloton's Advertising Plans for purposes of ICON's efforts to target Peloton's existing and potential customers and divert sales. Ryan Decl. at ¶ 23.

These plainly meet the "[g]rounds for irreparable injury includ[ing] loss of control of reputation, loss of trade, and loss of good will, intangible harms for which it is virtually impossible to ascertain the precise economic consequences." *AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, 145 F. Supp. 3d 311, 319 (D. Del. 2015) (internal quotations omitted) (citing *Kos-Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004)); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (holding that loss of trade secrets was an irreparable harm that could not be measured in money because "[a] trade secret once lost is, of course, lost forever"). If not enjoined, ICON through improper means and motive can continue to exploit the

unfair advantage it already gained by obtaining an unauthorized preview of Peloton's advertising strategies. ICON's further misappropriation will cause Peloton to lose customers, good will, and resulting profits. Various Circuit Courts, including the Third, have recognized that a loss of customers and, consequently, future profits, is an irreparable harm sufficient to justify issuance of injunctive relief. *See, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (recognizing loss of market share can constitute irreparable harm); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (recognizing loss of customers is an "irreparable injury").

### C.    Peloton's Narrowly Tailored Request For Injunctive Relief Will Simply Maintain The Legal Status Quo And Not Cause Greater Harm to ICON

The harm that Peloton will suffer if a TRO and preliminary injunction are not granted far outweighs any harm that ICON will incur if granted. Having improperly secured early access to Peloton's forthcoming marketing and advertising strategies, ICON is now in a position to create targeted counterprogramming to undercut Peloton's advertisements and business plans. If ICON is not enjoined, Peloton is in imminent danger of losing its trade secrets, losing the commercial advantage that Peloton is entitled to enjoy by deploying its confidential advertising and marketing strategies on Peloton's own timetable, and losing potential customers forever.

In contrast, a TRO and preliminary injunction would merely preserve the legal status quo, preventing ICON from further enjoying the unfair "head start" from wrongfully acquiring Peloton's Advertising Plans. In other words, granting Peloton's requested relief would merely prevent ICON from doing what it is prohibited from doing under the DTSA. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) (granting TRO in trade secrets case and finding that the balance of hardships favored plaintiff because the injunction merely required defendant not to engage in unlawful conduct); *Dish Networks L.L.C. v. Ramirez*, 2016 WL

- 19 -

3092184, at *7 (N.D. Cal. June 2, 2016) (balance of hardships favors granting injunctive relief when it would "do no more than require Defendant to comply with federal and state … laws") (citation omitted); *Takeda*, 2014 WL 5088690, at *3 ("maintaining the status quo" was appropriately considered in evaluating the balance of hardships and granting TRO).   Put differently, if ICON is not using and will not use Peloton's Advertising Plans in connection with ICON's business, then ICON will suffer no harm at all; but if, instead, persons at ICON who had exposure to Peloton's Advertising Plans have used, are using, or will have involvement with ICON's own marketing and advertising exercises, then the harm to Peloton is catastrophic.

### D.      The Public Interest Favors Granting a Preliminary Injunction to Peloton

"[T]he public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements" and "by enabling the protection of trade secrets." *Henry Schein*, 191 F. Supp. 3d at 1078 (granting TRO in DTSA case). Here, the public interest would be served by temporarily and preliminarily enjoining ICON until all of the facts and legal consequences of ICON's misappropriation can be addressed in this action. The public interest in preventing the theft of Peloton's trade secrets clearly outweighs a temporary restriction on ICON's ability to capitalize on that theft. *Id.*; *see SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985) (finding unnecessary an "extended analysis of the public interest [because] extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established"); *Takeda*, 2014 WL 5088690, at *3 (finding that "the public interest" favored TRO).

## IV.      CONCLUSION

For the foregoing reasons, Peloton requests that this Court grant its Motion for Temporary Restraining Order and for a Preliminary Injunction.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Michael J. Flynn (#5333)
Andrew M. Moshos (#6685)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
mflynn@mnat.com
amoshos@mnat.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*

OF COUNSEL:

Steven N. Feldman
Harry Mittleman
Ashley Artmann
HUESTON HENNIGAN LLP
523 W. 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340

November 16, 2020

- 21 -