IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PELOTON INTERACTIVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> iFIT INC., <br><br> Defendant. | Civil Action No. 20-1535-RGA |

MEMORANDUM

Before me is iFIT's Motion for Summary Judgment. (D.I. 145). I have reviewed the parties' briefing. (D.I. 148, 167, 172, 183-1, 183-2). For the reasons that follow, I will grant this motion and dismiss the other pending motions as moot.

I.  BACKGROUND

While working as a freelance prop man on a Peloton commercial shoot, Jeff Barber was given 34 pages of documents outlining the dialogue for two Peloton television commercials and the creative content for a companion digital advertising campaign (the "Scripts"). (D.I. 9-1, Ex. 2; *see* D.I. 148 at 1; D.I. 167 at 1). Mr. Barber had signed multiple NDAs and understood that the Scripts were confidential. (*See* D.I. 168-1, Ex. 1 at 17:3–18; Ex. 17). On October 25, 2020, Mr. Barber emailed a copy of the Scripts to his childhood friend, Kelley Chambers, who worked as a mechanic at iFIT, Peloton's competitor. (*See* D.I. 9-1, Ex. 2 at 1).

Eight days later, on November 2, 2020, iFIT produced the email and the Scripts to Peloton in a document production for a separate dispute between the parties. (D.I. 25 at ¶¶ 8–11). Approximately seven days later, Peloton discovered this email in the document

1

production. (D.I. 11 at ¶¶ 2–3; D.I. 25-1, Ex. A). Peloton then filed the present suit on November 16, 2020, alleging that iFIT violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. (D.I. 2). Peloton defines its trade secret as the overall content of the advertising campaign reflected in the Scripts. (D.I. 167 at 19).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's

2

evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III.  DISCUSSION

To establish a violation of the DTSA, Peloton must prove: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce, and (3) the misappropriation of that trade secret[.]" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (internal citations and quotations omitted). iFIT moves for summary judgment on Peloton's DTSA claim because Peloton has failed to show that iFIT misappropriated its trade secret. The DTSA defines "misappropriation" as: "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent" in certain circumstances. 18 U.S.C. § 1839(5). Peloton argues that iFIT misappropriated its trade secret through both acquisition and use.

3

### A. Acquisition of the Trade Secret by Improper Means

Peloton argues that iFIT misappropriated its trade secret by using improper means to acquire it. Under the DTSA, "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). During a telephone conversation, Mr. Barber told Mr. Chambers that he was working on a production for Peloton and had a copy of the Scripts. (D.I. 168-1, Ex. 3 at 60:2–61:22). Mr. Chambers testified that he jokingly told Mr. Barber, "Send that to me. That would be fun to read." (*Id.* at 64:25–65:2). When Mr. Barber responded, "No I can't do that," Mr. Chambers kept "ribbing" with his friend, stating, "Well, come on. It would be a great read for me." (*Id.* at 70:4–17). After the call, Mr. Barber emailed Mr. Chambers a copy of the Scripts, writing in the body of the email, "Dont [sic] forward or show my name." (D.I. 149-1, Ex. 1).

iFIT argues that Peloton cannot show that Mr. Chambers used improper means to acquire the Scripts because he was merely joking with a childhood friend. (D.I. 148 at 19). I disagree. This evidence is sufficient to create a genuine dispute as to whether Mr. Chambers induced Mr. Barber to breach his duty of secrecy and send him the Scripts. Mr. Chambers appeared to know that these scripts were confidential but continued to ask his friend to send him a copy.

iFIT argues that, in any event, Mr. Chambers' improper acquisition of the Scripts cannot be imputed to iFIT under the doctrine of respondeat superior. (*Id.*). Peloton's only response is that the doctrine of respondeat superior does apply here because "the evidence shows that Mr. Chambers was motivated by a desire to serve iFIT's interests in discovering everything he could about Peloton's marketing activities." (D.I. 167 at 21).

4

Under the doctrine of respondeat superior,[1] an employer is only liable for an employee's torts committed within the scope of his employment. *Hecksher v. Fairwinds Baptist Church, Inc.*, 115 A.3d 1187, 1200 (Del. 2015). To determine whether an employee's conduct is within the scope of employment, Delaware courts look to the factors set out in the Restatement (Second) of Agency. *Id.* Section 228 of the Restatement provides that an employee's act falls within the scope of his employment if: "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the [employer]." Restatement (Second) of Agency § 228.

Mr. Chambers' acquisition of the Scripts was clearly outside the scope of his employment with iFIT. He was the "director of samples in [iFIT's] machine and fabrication shops." (D.I. 28 at ¶¶ 2–3). In this role, he was the mechanic in charge of painting, welding, and assembling product samples; he was not in the marketing department. (*Id.*). Discovering the advertising plans of iFIT's competitor was not included in his job duties. Mr. Chambers' actions have no conceivable relationship to his actual duties at iFIT. Further, Peloton has provided no evidence that anyone at iFIT asked Mr. Chambers to obtain Peloton information or that Mr. Chambers was motivated by iFIT's interests to discover Peloton's confidential marketing activities. Mr. Chambers did give a copy of the Scripts to his supervisor, Jared Willardson, but there is no

---

[1] Both parties proceed on the assumption that an employer can be held vicariously liable for its employee's misappropriation under the DTSA. While the Third Circuit has not yet addressed this issue, many federal district courts have held that the DTSA allows for respondeat superior liability. *See, e.g., Navigation Holdings, LLC v. Molavi*, 2020 WL 5074307, at *3 (N.D. Cal. Aug. 25, 2020); *Inventus Power, Inc. v. Shenzhen Ace Battery Co.*, 2020 WL 3960451, at *11 (N.D. Ill. July 13, 2020); *Brain Inj. Ass'n of Cal. v. Yari*, 2020 WL 3643482, at *6 (C.D. Cal. Apr. 30, 2020); *Bombardier Inc. v. Mitsubishi Aircraft Corp.*, 383 F. Supp. 3d 1169, 1188 (W.D. Wash. 2019).

evidence that Mr. Willardson instructed Mr. Chambers to acquire the Scripts or that he even had the authority to do so. Thus, the doctrine of respondeat superior does not apply here. I will therefore grant summary judgment on Peloton's theory of misappropriation based on improper acquisition.

### B. Use of the Trade Secret

Peloton argues that iFIT misappropriated its trade secret by using the trade secret to inform iFIT's marketing strategy. "[T]he 'use' of a trade secret encompasses all the ways one can take advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose[.]" *Oakwood*, 999 F.3d at 910.

Peloton points to several pieces of circumstantial evidence to show that iFIT used the Scripts. For example, several iFIT witnesses testified that iFIT made unidentified changes to its commercials during November and December 2020, after iFIT received the Scripts. (D.I. 168-2, Ex. 40 at 134:18–135:5; Ex. 45 at 75:6–76:3; Ex. 46 at 75:19–76:2). Additionally, on November 4, 2020—ten days after Mr. Chambers received the Scripts—iFIT scheduled a call with advertising agency MerchantCantos to discuss an advertising campaign for iFIT's ProForm brand. (*Id.*, Ex. 49). MerchantCantos "agreed to a fast timeline to execute the creative." (*Id.*, Ex. 40 at 143:5–11). These advertisements publicly aired on November 21, 2020, and January 11, 2021. (D.I. 174).

6

Peloton argues that iFIT's ProForm advertisements strongly resemble the Scripts, which shows that iFIT copied the Scripts.[2] For example, iFIT's advertisements used actors that looked similar to the potential casting decisions reflected in the Scripts. (D.I. 167 at 2; D.I. 168-1, Ex. 5 at 26, 29). Additionally, Peloton's Scripts describe an opening scene where, "A father checks on his sleeping baby in their nursery and then tip-toes towards the bike/walks by his sleeping kid tip toeing." (D.I. 168-1, Ex. 5 at 3). iFIT's January 2021 advertisement has a similar scene where a father comforts his baby in a nursery.

Peloton does not provide any evidence that these minor similarities are attributable to iFIT's use of Peloton's trade secret. Instead, there is nothing to suggest that the similarities are anything other than the sorts of coincidental similarities that one would expect from competitors marketing similar products to similar target audiences. The actors used by iFIT resemble the "stock" actor types that have been used many times by both iFIT and Peloton. (*See* D.I. 173-1, Ex. 44; D.I. 174-1, Exs. A–B). Further, the idea of having a father and his baby in a fitness equipment advertisement is not something that iFIT needed Peloton's Scripts to conceive of or to replicate. Without more, these "similarities" are insufficient to show misappropriation. *See, e.g., Stratienko v. Cordis Corp.*, 429 F.3d 592, 601–02 (6th Cir. 2005) (reviewing a grant of summary judgment and holding that plaintiff's evidence regarding the similarities between plaintiff's and defendant's catheters was insufficient to support a finding of "use" because plaintiff "fail[ed] to identify which, if any, *innovative* features his and [defendant's] designs

---

[2] iFIT asks this Court to bar Peloton from presenting this "copied content" theory because it was not timely disclosed. (D.I. 172 at 2–5). While I do think it is likely that Peloton did not timely disclose this theory, I need not decide this issue. Even considering this "copied content," Peloton has failed to provide prima facie evidence that iFIT used its trade secret.

7

share"); *LiiON, LLC v. Vertiv Grp. Corp.*, 2021 WL 4963610, at *7 (N.D. Ill. Oct. 26, 2021) (granting summary judgment of no trade secret misappropriation because plaintiff failed to provide any evidence that the similar features between plaintiff's and defendant's products "are actually attributable to [the defendant's] use of [the plaintiff's] alleged trade secrets").

Peloton also argues that iFIT "dramatically" increased its advertising spend after it acquired Peloton's trade secret. (D.I. 167 at 13–15). Specifically, iFIT spent $37.6 million over its projected marketing spend for January/February 2021. (*See* D.I. 168-2, Ex. 51 at 7, 9, 43). Peloton argues that based on iFIT's increase in its advertising spend and iFIT's contradictory explanations for this increase, a reasonable juror could infer that iFIT used the Scripts to inform its advertising spend. (D.I. 167 at 24). I disagree. Peloton's advertising spend theory is entirely speculative. The only "evidence" connecting this spending increase to Peloton's trade secret is the fact that iFIT received the Scripts two months earlier. But this attenuated connection is insufficient to show that iFIT used the Scripts.

Not only is there nothing to connect the Scripts to increased advertising spending, there were multiple reasons, based on undisputed facts, why iFIT increased its spending on advertising. For example, there was a high demand for fitness equipment around New Year's and due to COVID, leading to increased sales. (*See, e.g.*, D.I. 149-1, Ex. 10, Schedule 2.7; D.I. 150, Ex. 27 at 65:21–66:8; Ex. 28 at 84:23–86:5; Ex. 30 at 90:17–91:11). Further, in October 2020, iFIT received an investment of $200 million from the private equity firm L Catterton. (*See* D.I. 150, Ex. 30 at 35:6–37:24; Ex. 32 at 163:10–22, 165:10–23). These reasons,

8

combined with typical competition and market conditions, all contributed to iFIT's increased advertising spending.[3]

Further, iFIT's advertising spend in November and December 2020—right after it received the Scripts—roughly tracked its projections. (D.I. 168-2, Ex. 51 at 5, 7, 43). If iFIT used the Scripts to inform its strategy for its New Year's campaign and the "copied" ProForm advertisements, it is unclear why its advertising spend did not "dramatically" increase until January and February 2021 (after Peloton publicly launched its New Year's campaign and extinguished most, if not all, of its trade secret).

Thus, I conclude that, based on this record, no reasonable juror could infer that iFIT's increased advertising spend was a result of iFIT using Peloton's trade secret.

Peloton points to "plus factors" to further support its circumstantial evidence of use. For example, Peloton argues that iFIT's monitoring of Peloton's public marketing activities shows that it had motive to discover Peloton's secret marketing plans. (D.I. 167 at 24–25). But the lawful monitoring of a competitor's marketing activities—which is commonplace in the

---

[3] Peloton claims that iFIT's witnesses have provided "contradictory testimony" explaining this increase in advertising spending. (D.I. 167 at 14–15). For example, iFIT's Director of Advertising, Douglas Stevenson, testified that the Catterton investment led to a $30 million increase in iFIT's advertising spend (D.I. 168-2, Ex. 52 at 91:5–14), while iFIT's VP of Marketing, Joel Dewberry, testified that iFIT intended to invest "an infusion of capital" in "a $100 million consumer advertising plan for ProForm." (*Id.*, Ex. 40 at 150:3–151:14; Ex. 56 at 2). There is no real inconsistency between these statements. Testimony that the investment led to a $30 million increase in advertising spend over some undefined period of time is not necessarily inconsistent with testimony that iFIT planned to invest in "a $100 million advertising plan" over another undefined period. Additionally, Peloton points out that iFIT's VP of Paid Media, Tyler Dixon, testified that he did not recall receiving any additional funds based on the Catterton investment. (*Id.*, Ex. 53 at 28:12–23). The fact that one witness could not recall receiving additional funds does not contradict the testimony of the several other witnesses who did remember. These "inconsistences" do not create any genuine dispute regarding the reasons for iFIT's increased advertising spending.

9

"connected fitness" industry (*see* D.I. 150-1, Ex. 24 at 68:17–24; Ex. 26 at 75:24–76:20, 227:2–7)—and other lawful competition are not evidence of trade secret misappropriation. Peloton also argues that iFIT's failure to immediately notify Peloton of its acquisition of the Scripts supports a finding of misappropriation. (D.I. 167 at 23–25). I disagree. There is no evidence that iFIT actively concealed its acquisition of the Scripts from Peloton. iFIT produced to Peloton the evidence of its possession of Peloton's trade secret one week after it obtained the trade secret, albeit without realizing it was doing so. Within another week, Peloton recognized that iFIT had the trade secret.

Throughout this litigation, iFIT has maintained a consistent story regarding what it did with the Scripts. On October 26, 2020, after returning to the office, Mr. Chambers printed a copy of the Scripts from his email. (D.I. 150, Ex. 39 at 104:18–21, 106:2–10). After reading a portion of the Scripts, Mr. Chambers brought the document to his immediate supervisor, Mr. Willardson, VP of Product Development. (*Id.* at 106:11–107:4). Mr. Willardson quickly flipped through the Scripts and told Mr. Chambers not to share the document with anyone. (*Id.*, Ex. 37 at 110:17–111:4, 114:1–5). Mr. Willardson then put the Scripts in a sealed envelope and gave the envelope to iFIT's in-house counsel. (*Id.* at 121:11–24, 125:15–24). Mr. Chambers and Mr. Willardson have both testified that they never disseminated the Scripts. (*Id.* at 134:5–135:8; Ex. 39 at 186:13–188:17).

After iFIT produced Mr. Barber's email in a separate document production, Peloton contacted iFIT's outside counsel and requested that iFIT quarantine the email. (*See* D.I. 25-1, Ex. A). On November 18, 2020, iFIT hired computer forensics expert Dr. Chuck Easttom to search iFIT's systems to ensure that the Scripts had not been disseminated. (D.I. 26 at ¶¶ 3–6).

Dr. Easttom deleted the Barber email and the Scripts and confirmed that the Scripts had not been disseminated on iFIT's system. (*Id.* at ¶¶ 19–21; D.I. 153-1, Exs. 13–14).[4] Multiple iFIT witnesses testified that they never saw the Scripts and did not use the Scripts. (*See, e.g.*, D.I. 150, Ex. 28 at 71:8–73:11; Ex. 31 at 142:23–144:9; Ex. 33 at 42:1–43:3; Ex. 36 at 105:12–106:7).

Peloton has provided no evidence to support a finding that iFIT did anything with the Scripts. Instead, Peloton's theory of misappropriation is based on speculation.[5] Peloton's evidence—i.e., the unremarkable similarities between iFIT's ProForm advertisements and Peloton's Scripts; iFIT's increased advertising spending; iFIT's monitoring of Peloton's marketing activities; and iFIT's failure to immediately notify Peloton of its acquisition of the Scripts—is insufficient to show that iFIT used Peloton's trade secret. Thus, I will grant iFIT's motion for summary judgment.

## IV.    CONCLUSION

An appropriate order will issue.

---

[4] Peloton moves to strike multiple paragraphs of Dr. Easttom's expert reports because iFIT has not disclosed the data on which Dr. Easttom relied. (D.I. 146). Peloton states, however, "Significant components of Dr. Easttom's opinions will remain—including his ultimate conclusions (however unfounded) that Mr. Chambers did not disseminate the Trade Secret—and iFIT will be free to use those opinions to support its summary judgment motion." (D.I. 147 at 18). Thus, I need not resolve Peloton's motion to strike in order to rely on Dr. Easttom's ultimate opinion that the Scripts had not been disseminated.

[5] Perhaps even more speculative is Peloton's claim that it is entitled to damages equal to an unidentified percentage of $80 million. (*See, e.g.*, D.I. 149-1, Ex. 10 at ¶ 103 (damages expert report) ("Peloton incurred at least $80 million to implement the Trade Secrets (media spend for advertising). If the trier of fact determines that a certain percentage of Peloton's spend in connection with implementing the Trade Secrets has been diminished by iFIT's misappropriation, then a percentage may be applied against this $80 million spend to calculate Peloton's losses.")).


Entered this 13 day of May, 2022.

_____
United States District Judge

12